Filed 1/13/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039071 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS121299) |
| v. | |
| MICHAEL RAY GONZALES, | |
| Defendant and Appellant. | |

Defendant Michael Ray Gonzales was convicted by jury trial of permitting a person to carry a loaded firearm in a vehicle (Pen. Code, § 26100, subd. (a)).[1] The jury also found true a gang allegation (§ 186.22, subd. (d)). The court suspended imposition of sentence and placed defendant on probation. On appeal, defendant challenges his conviction on the ground that the prosecution failed to prove that he knew the gun was loaded. Section 26100, subdivision (a) makes it a misdemeanor "for a driver of any motor vehicle . . . *knowingly* to permit any other person to carry into or bring into the vehicle a firearm *in violation of Section 25850* of this code or Section 2006 of the Fish and Game Code." (§ 26100, subd. (a), italics added.) Section 25850 and Fish and Game Code section 2006 apply only where the firearm is loaded. Defendant also contends that the trial court prejudicially erred in failing to instruct the jury that knowledge the firearm

---

[1] Subsequent statutory references are to the Penal Code unless otherwise specified.

is loaded is an element of the offense. In addition, defendant challenges the sufficiency of the evidence to support the jury's true finding on the gang allegation.[2]

We disagree with the First District Court of Appeal's holding in *In re Ramon A.* (1995) 40 Cal.App.4th 935 (*Ramon A.*) and find that a section 26100, subdivision (a) conviction requires proof that the defendant knew the firearm was loaded. Although the prosecution presented sufficient evidence to prove this element of the offense, the trial court prejudicially erred by failing to instruct the jury that the prosecution was required to prove this fact. Consequently, we reverse the judgment and remand for a new trial. We find that there was sufficient evidence to support the gang allegation, so the prosecution may retry that allegation in conjunction with the substantive offense.

## I. Facts

On the afternoon of July 8, 2012, police officers pulled over defendant's vehicle. Defendant, aged 27, was the driver, and his two passengers were 15-year-old boys. The officers asked defendant and his passengers to exit the vehicle. As the front seat passenger, John Doe One, got out of the vehicle, he told the officers: " 'I'm not gonna lie to you, sir. I have a loaded gun on me.' " He was wearing baggy clothing that concealed the firearm. John Doe One told the officers that the gun was in his waistband, and one of the officers removed it. The gun was a functional .45-caliber semiautomatic pistol that had been reported stolen. It had bullets in its magazine. John Doe One's cell phone bore references to the Santa Rita Bahamas Norteno gang. The rear seat passenger, John Doe Two, was a self-acknowledged Santa Rita Bahamas Norteno gang member. A search of

---

[2] Defendant also challenges two of the probation conditions, but we need not reach these challenges in light of our reversal of his conviction.

the vehicle turned up "Norteno rap" compact discs in the glove compartment, center console, and trunk.

Defendant was arrested. He admitted that he knew there was a firearm in the vehicle, although he had not seen it. "John Doe One had told him prior to entering the vehicle, quote, 'I got something,' grabbed his waistband area and shook it up and down, making it pretty obvious to [defendant] that he had a firearm with him." Defendant told the police that he had been taking the two boys at their request to "Northgate Village," which the police knew to be "a common Norteno hangout." Defendant's cell phone bore Norteno indicia and particularly indicia of the Santa Rita Bahamas Norteno gang.

## II. Discussion

### A. Substantive Offense

Defendant contends that section 26100, subdivision (a) is not violated unless the driver of the vehicle knows the firearm is loaded. On this basis, he contends that the evidence was insufficient and that the trial court's instruction on the elements of this offense was prejudicially deficient.

### 1. Background

At the instruction conference, the prosecutor raised an issue about the instruction on the elements of the substantive offense. "[S]omething did come to my attention as far as [CALCRIM No.] 2530 goes. That is, that in the jury instructions for 26100(a), number 3, it says that the defendant knew that he was permitting someone to carry a 'loaded' firearm in the vehicle. I don't believe he had to know it was loaded. I believe he just had to know it was a firearm. [¶] When you look at the instruction from 25850 [(CALCRIM No. 2530)], it says in element two, which kind of corresponds to element three, that the

3

person knew he was carrying a firearm. The word 'loaded' does not appear."[3] The defense objected "to removing the knowledge requirement regarding the firearm being loaded." The court overruled the objection. "[T]he Court finds it improbable that the [L]egislature meant that if you permit someone to bring a firearm into your vehicle you have to then verify whether it's loaded or not." "It would put, arguably, the People in an impossible position of how do you prove knowledge and then knowledge that the gun was loaded."

The trial court instructed the jury: "The defendant is charged in Count 1 with permitting a person to bring a loaded firearm into a vehicle, in violation of Penal Code Section 26100(a). [¶] To prove that the defendant is guilty of this crime, the People must prove: [¶] One, that the defendant was the driver of the vehicle; [¶] Two, the defendant permitted another person to carry a loaded firearm in a vehicle, in violation of Penal Code Section 25850; [¶] And three, the defendant knew he was permitting someone to carry a firearm in the vehicle. [¶] To prove that another person was carrying a loaded firearm in violation of Penal Code Section 25850, the People must prove that: [¶] One, another person carried a loaded firearm on his person or in a vehicle; [¶] Two, the person knew he was carrying a firearm; [¶] And three, at that time that person was in a public place or on a public street in an unincorporated city."

## 2. Analysis

Section 26100, subdivision (a) makes it a misdemeanor "for a driver of any motor vehicle . . . *knowingly* to permit any other person to carry into or bring into the vehicle a

---

[3]     CALCRIM does not contain a pattern instruction for a violation of section 26100, subdivision (a). CALCRIM No. 2530, the pattern instruction for a violation of section 25850, subdivision (a), which is the underlying offense for a violation of section 26100, subdivision (a), was apparently used as a template for the instruction given by the trial court.

firearm *in violation of Section 25850* of this code or Section 2006 of the Fish and Game Code." (§ 26100, subd. (a), italics added.) Section 25850 and Fish and Game Code section 2006 apply only where the firearm is loaded.[4] Neither of them contains an express knowledge element.

Section 26100, subdivision (a) contains an express knowledge element. The issue before us in this case is the scope of the required knowledge. Defendant contends that the knowledge element of a section 26100, subdivision (a) offense "unambiguous[ly]" requires proof that the driver not only knew that the passenger had a firearm but also knew that the firearm was loaded. He observes that "[t]he word 'knowingly' imports only a knowledge that the facts exist which bring the act or omission within the provisions of this code." (§ 7, subd. (5).) Since one of the facts that must exist for a driver's act to be "within the provisions" of section 26100, subdivision (a) is that the passenger's firearm is loaded, defendant reasons that the knowledge element necessarily requires knowledge of that fact.

The Attorney General, on the other hand, relies on the holding in *Ramon A.* that a violation of former section 12034 (the predecessor to section 26100, subdivision (a)) did not require proof that the driver knew the passenger's firearm was loaded.[5] Defendant

---

[4] Section 25850 provides: "A person is guilty of carrying a *loaded* firearm when the person carries a *loaded* firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory." (§ 25850, subd. (a), italics added.) Fish and Game section 2006 is similar. "It is unlawful to possess a loaded rifle or shotgun in any vehicle or conveyance or its attachments which is standing on or along or is being driven on or along any public highway or other way open to the public. (Fish & G. Code, § 2006.)

[5] Former section 12034, as originally enacted in 1977, read: "It is a misdemeanor for a driver of any motor vehicle . . . knowingly to permit any other person to carry into or bring into the vehicle a firearm in violation of Section 12031 [the predecessor to section 25850] . . . or knowingly to permit such person to discharge any firearm from

(*continued*)

5

responds that the First District's decision in *Ramon A.* is inconsistent with the California Supreme Court's subsequent holdings that a defendant must know of the characteristics of a weapon that make its possession unlawful even where the specific statute itself contains no express knowledge requirement.

We exercise de novo review in addressing this issue of statutory construction. (*People v. Brewer* (2011) 192 Cal.App.4th 457, 461.)  "Statutory construction begins with the plain, commonsense meaning of the words in the statute, '"because it is generally the most reliable indicator of legislative intent and purpose."'  [Citation.] 'When the language of a statute is clear, we need go no further.'"  (*People v. Manzo* (2012) 53 Cal.4th 880, 885 (*Manzo*).)  Where the language of the statute is potentially ambiguous, "'[i]t is appropriate to consider evidence of the intent of the enacting body in addition to the words of the measure, and to examine the history and background of the provision, in an attempt to ascertain the most reasonable interpretation.'  [Citation.]  We may also consider extrinsic aids such as the ostensible objects to be achieved, the evils to be remedied, and public policy.  [Citation.]  When construing a statute, 'our goal is "'to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.'"'"  (*Manzo*, at p. 886.)

In *Ramon A.*, the First District examined former section 12034's statutory language and its legislative history and found them to be ambiguous.  However, it concluded that the purpose of the statute, to deter drive-by shootings, unambiguously required that knowledge that the firearm was loaded *not* be an element of the offense. (*Ramon A.*, *supra*, 40 Cal.App.4th at pp. 941-942.)  "This legislative objective—to deter

_____

such vehicle in violation of any provision of this code."  (Stats. 1977, ch. 528, § 1, p. 1732.)  At that time, former section 12031 provided, with certain exceptions, that "every person who carries a loaded firearm on his person or in a vehicle . . . is guilty of a misdemeanor."  (Stats. 1976, ch. 1426, § 3, p. 6377.)  Former section 12031 had always contained this provision.  (Stats. 1967, ch. 960, § 1, p. 2459.)

drive-by shootings by making an owner or driver criminally responsible for the presence of loaded guns in the vehicle—cannot be effectively served if conviction under section 12034 requires proof of knowledge that the gun was loaded. The fact that a gun is loaded is rarely evident without inspection. Even if the driver possesses such knowledge, it can only be proven by an admission, or by evidence that another person told the driver the gun was loaded, that the act of loading occurred in the driver's presence, or that the driver acquired such knowledge from some other event, such as the gun's being fired. Rare indeed will be the prosecution under section 12034 in which any such evidence is available. As a practical matter, then, appellant's reading would render the statute largely impotent to achieve its avowed purpose." (*Ramon A.*, at p. 941.) "The duty thus imposed is little different from that which burdens the immediate possessor of the gun under section 12031(a)(1). It is settled that the latter statute does *not* require proof that the possessor knew the gun was loaded. (*People v. Dillard* (1984) 154 Cal.App.3d 261, 263, 201 Cal.Rptr. 136; see *People v. Harrison* (1969) 1 Cal.App.3d 115, 120, 81 Cal.Rptr. 396.)" (*Ramon A.*, at p. 942.) The First District held that the burden was on the driver to ensure that the passenger's firearm was not loaded.

*People v. Dillard* was a prior First District opinion holding that knowledge that the firearm is loaded was not an element of a violation of former section 12031, the predecessor to section 25850. (*People v. Dillard* (1984) 154 Cal.App.3d 261, 266 (*Dillard*).) In *Dillard*, the First District concluded that "Section 12031, subdivision (a), is, in our view, a quintessential public welfare statute which embraces a legislative judgment that in the interest of the larger good, the burden of acting at hazard is placed upon a person who, albeit innocent of criminal intent, is in a position to avert the public danger." (*Dillard*, at p. 266.)

The First District's holdings in *Dillard* and *Ramon A.* preceded the "evolution of [the California Supreme Court's] mens rea jurisprudence." (*Stark v. Superior Court* (2011) 52 Cal.4th 368, 395 (*Stark*).) In 2000, the California Supreme Court decided *In re*

7

*Jorge M.* (2000) 23 Cal.4th 866 (*Jorge*). *Jorge* concerned former section 12280, which prohibited possession of an assault weapon and did not contain an express mens rea element. The issue was whether section 12280 nevertheless could not be violated without knowledge of the character of the weapon or instead was a "public welfare offense" that could be committed without proof of any particular mental state. (*Jorge*, at pp. 872-873.)

In *Jorge*, the California Supreme Court applied a seven-factor test in deciding whether the Legislature had intended for the offense to be a "public welfare offense." It considered: "(1) the legislative history and context; (2) any general provision on mens rea or strict liability crimes; (3) the severity of the punishment provided for the crime ('Other things being equal, the greater the possible punishment, the more likely some fault is required'); (4) the seriousness of harm to the public that may be expected to follow from the forbidden conduct; (5) the defendant's opportunity to ascertain the true facts ('The harder to find out the truth, the more likely the legislature meant to require fault in not knowing'); (6) the difficulty prosecutors would have in proving a mental state for the crime ('The greater the difficulty, the more likely it is that the legislature intended to relieve the prosecution of that burden so that the law could be effectively enforced'); (7) the number of prosecutions to be expected under the statute ('The fewer the expected prosecutions, the more likely the legislature meant to require the prosecuting officials to go into the issue of fault')." (*Jorge*, *supra*, 23 Cal.4th at p. 873.)

The statutory language and legislative history in *Jorge* were inconclusive. (*Jorge*, *supra*, 23 Cal.4th at pp. 872-875.) The decisions interpreting other statutes prohibiting possession of weapons were not definitive. (*Id.* at pp. 875-879.) California's general statutory provision on mens rea, section 20, required a minimum of criminal negligence. (*Jorge*, at p. 879.) A violation of former section 12280 was a wobbler, but, depending on whether prior convictions were alleged, it was punishable by as much as life in prison. (*Jorge*, at p. 879.) "The Legislature's choice of potential felony punishment for violation of section 12280(b), however, reinforces the presumption expressed by section 20 and

suggests that correspondingly strong evidence of legislative intent is required to exclude mens rea from the offense." (*Id.* at p. 880.) The California Supreme Court held that, despite the absence of an express mens rea element in the statute, the offense required proof that "the defendant *knew or reasonably should have known* the firearm possessed the characteristics bringing it within the [statute]." (*Id.* at p. 887.)

Our task in construing section 26100, subdivision (a) begins with the statutory language. The statute contains an express knowledge requirement. The Legislature described the offense as "*knowingly* to permit any other person to carry into or bring into the vehicle a firearm *in violation of Section 25850 . . . .*" (§ 26100, subd. (a), italics added.) Defendant claims that this statutory language *unambiguously* requires knowledge that the firearm *is loaded*. We do not find this language to be without ambiguity. One reading is that the "knowingly to permit" language applies only to the facts expressly identified, the person carrying a firearm into the vehicle. Another reading is that the "knowingly to permit" language also applies to the facts making the carrying of the firearm into the vehicle "in violation of Section 25850." The First District concluded in *Ramon A.* that this statutory language was ambiguous, and with that conclusion we agree. The question of whether the owner/driver must know the facts that make the passenger's carrying of the firearm into the vehicle a violation of section 25850 or need only know that the passenger is carrying a firearm cannot be resolved based solely on the statutory language. The word "knowingly" clearly modifies "permit," and "permit" clearly applies to the carrying of the firearm into the vehicle. Whether "knowingly" and "permit" apply to the facts necessary to a violation of section 25850 is not explicitly addressed and is not clear from the statutory language alone.

We next examine the legislative history, background, and purpose of the statute to determine what the Legislature actually intended to be the scope of the knowledge element. Section 26100, subdivision (a) is a reenactment of former section 12034. Former section 12034 was enacted by Senate Bill No. 811 in 1977. Senate Bill No. 811

9

was intended to "discourage shooting from and between vehicles."  (Sen. Democratic Caucus, analysis of Sen. Bill No. 811 (1977-1978 Reg. Sess.) as amended June 15, 1977.) As originally introduced, it would have applied only to the owner of the vehicle and only if the owner "permit[ted] any person to use, operate, or occupy such motor vehicle with the owner's actual knowledge that such person will unlawfully possess a firearm in such motor vehicle in violation of Section 12031 . . . ."  (Sen. Bill No. 811 (1977-1978 Reg. Sess.) as introduced on April 1, 1977.)  The Legislative Counsel's digest described the original version's knowledge element as "actual knowledge that such person will unlawfully possess a loaded firearm in such vehicle . . . ."  (*Ibid.*)

On May 12, 1977, Senate Bill No. 811 was amended so that it extended to not only owners but also drivers.  This amendment also extended the prohibition to instances where the owner or driver himself or herself carried the firearm into the vehicle and revised the wording of the prohibition to the "knowingly to permit" language that was ultimately enacted.  (Sen. Bill No. 811 (1977-1978 Reg. Sess.) as amended May 12, 1977.)  The Legislative Counsel's digest of this amended version simply repeated the proposed statutory language.  (*Ibid.*)  Senate Bill No. 811 was again amended on May 25, 1977 to remove the portion of the wording added by the May 12 amendment that applied the prohibition to an owner or driver himself or herself carrying the firearm into the vehicle.  (Sen. Bill No. 811 (1977-1978 Reg. Sess.) as amended May 25, 1977.)  There were no further substantive amendments to Senate Bill No. 811.[6]

An Assembly committee bill analysis of the final version of Senate Bill No. 811 described the proposed statute as making it a "misdemeanor for the driver or owner of a vehicle . . . to <u>knowingly permit</u> any other person to carry or bring into a vehicle a loaded

---

[6]     The final amendment of the bill was limited to whether it required an appropriation.  (Sen. Bill No. 811 (1977-1978 Reg. Sess.) as amended June 15, 1977.)

firearm . . . ." (Assem. Com. on Criminal Justice, Rep. on Sen. Bill No. 811 (1977-1978 Reg. Sess.) as amended June 15, 1977, original underscoring.)  It also said:  "Whether this bill is capable of enforcement will in large part depend on the interpretation of the term 'permit.'  It may mean that the driver or owner has an absolute duty to prevent, in which case an owner will be liable if he has knowledge that someone possesses a weapon in his or her vehicle.  If it means, with his or her consent, then this statute may not be capable of enforcement since the defendant could always plead that they objected but were unable to prevent the passenger or user of the vehicle from bringing the weapon into the vehicle." (*Ibid.*)  And it stated:  "Essentially this bill makes the owner or driver of a vehicle criminally liable for permitting someone else to violate a law.  Is this a form of vicarious liability?" (*Ibid.*, original underscoring.)

The Senate Republican Caucus's analysis of the final version of the bill described it as making it a misdemeanor for a driver or owner "knowingly to permit any person to bring unlawfully a loaded firearm into the vehicle . . . ." (Sen. Republican Caucus, 3d reading analysis of Sen. Bill No. 811 (1977-1978 Reg. Sess.) June 1, 1977.)  Two enrolled bill reports characterized the proposed law in different ways.[7]  One said:  "Strict liability on the owner or driver will not be imposed by this bill.  The owner must 'knowingly permit' the firearm in the vehicle before criminal sanctions can be imposed. This is perhaps imposing vicarious liability on the driver or owner for permitting

---

[7]      An enrolled bill report is properly considered as part of the bill's legislative history because it is "likely to reflect the understanding of the Legislature that enacted the statute . . . particularly because it is written by a governmental department charged with informing the Governor about the bill so that he can decide whether to sign it, thereby completing the legislative process.  Although these reports certainly do not take precedence over more direct windows into legislative intent such as committee analyses, and cannot be used to alter the substance of legislation, they may be as here 'instructive' in filling out the picture of the Legislature's purpose." (*In re Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1218, fn. 3.)

11

someone else to violate the law." (Legal Affairs Dept., Enrolled Bill Rep. on Sen. Bill No. 811 (1977-1978 Reg. Sess.) Aug. 30, 1977.) Another enrolled bill report characterized the bill as applying to persons who have passengers "knowing that [the passengers] possessed loaded [firearms] . . . ." (Dept. of Fish & Game, Enrolled Bill Rep. on Sen. Bill No. 811 (1977-1978 Reg. Sess.) August 25, 1977.)

This evidence of the Legislature's intent establishes that it understood that the proposed statute would require knowledge that the firearm was loaded. The Legislative Counsel's digest of the original version of the statute stated as much. There is no indication in the legislative history that the amendment of the statute was intended to reduce the scope of the knowledge element. Indeed, the evidence is to the contrary. The Assembly committee analysis, the Republican caucus analysis, and the enrolled bill report from the Department of Fish and Game each characterized the final enacted version of the bill as requiring that the owner/driver know that the passenger has a "loaded" firearm.

In *Ramon A.*, the First District found the legislative history of Senate Bill No. 811 to be "equivocal" on this point. (*Ramon A.*, *supra*, 40 Cal.App.4th at p. 939.) It relied heavily on a letter to the Governor from the author of Senate Bill No. 811 and references in committee reports about other bills proposing unrelated amendments a decade later. This reliance was erroneous. A letter to the Governor from the author of a bill is not evidence of the Legislature's intent because " 'no guarantee can issue that those who supported his proposal shared his view of its compass.' " (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 700.) Committee reports about subsequent bills involving unrelated amendments, while not entirely irrelevant, may not be utilized to rebut evidence of the Legislature's actual intent at the time it enacted a statute. "Although a legislative expression of the intent of an earlier act is not binding upon the courts in their construction of the prior act, that expression may properly be considered together with other factors in arriving at the true legislative intent

12

existing when the prior act was passed." (*Eu v. Chacon* (1976) 16 Cal.3d 465, 470; accord *Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 492.) The Legislature's expressions of its intent at the time it passes a bill cannot be rebutted by subsequent statements by a different Legislature about its retrospective understanding of the nature of the previous enactment. The First District's legislative history analysis in *Ramon A.* reached an incorrect conclusion because it relied on improper sources, rather than on the actual evidence of the Legislature's intent when it enacted this statute.

The First District also erred in *Ramon A.* in concluding that the rule of lenity was inapplicable. " '[T]hat rule generally requires that "ambiguity in a criminal statute should be resolved in favor of lenity, giving the defendant the benefit of every reasonable doubt on questions of interpretation. But . . . 'that rule applies "only if two reasonable interpretations of the statute stand in relative equipoise." [Citation.]' [Citations.]" [Citations.]' [Citation.] 'The rule of lenity does not apply every time there are two or more reasonable interpretations of a penal statute. [Citation.] Rather, the rule applies " 'only if the court can do no more than guess what the legislative body intended; there must be an *egregious* ambiguity and uncertainty to justify invoking the rule.' " [Citation.]' " (*People v. Nuckles* (2013) 56 Cal.4th 601, 611.)

The First District in *Ramon A.* rejected application of the rule of lenity on the ground that "there can be no doubt" that the purpose of Senate Bill No. 811 "would be thwarted" if the knowledge element's scope extended to the fact that the firearm was loaded. (*Ramon A.*, *supra*, 40 Cal.App.4th at p. 941.) Not so. The purpose of the statute was to discourage shootings from vehicles by a limited extension of criminal liability to the owner/driver of a vehicle in which a loaded firearm is carried by a passenger. The ambiguity concerns whether the Legislature intended for criminal liability to extend to any owner/driver who knew a passenger had a firearm or wished to limit it to only those who knew their passenger's firearm was loaded. The legislative history strongly supports

13

a conclusion that the Legislature actually intended to limit criminal liability to only those owners/drivers who knew the firearm was loaded.

The Legislature had a readily apparent rationale for limiting the prohibition to an owner/driver who knows the firearm is loaded. An owner/driver who knows only that a passenger has a firearm, but not that the firearm is loaded, does not act with any criminal intent since carrying an unloaded firearm in a vehicle is not illegal. The owner/driver is not knowingly permitting a *crime* to occur. Extending criminal liability to such an owner/driver would make anyone who transported a fellow hunter or target shooter criminally liable if the passenger had failed to unload his or her firearm. The owner/driver would have no readily available means of avoiding criminal liability other than requiring every passenger with a firearm to allow the owner/driver to personally verify that it was unloaded. He or she could not merely ask the passenger if it was loaded because the passenger might mistakenly or falsely deny that a loaded firearm was loaded. And the risk of harm to the owner/driver from attempting to physically verify the status of every passenger's firearm might well exceed the risks that the statute was intended to deter as the firearm might inadvertently discharge or another mishap might occur. Nor is it true that the enforceability of the prohibition would be substantially hindered by a requirement that the owner/driver know that the firearm is loaded. Only a loaded firearm poses an immediate danger of a shooting from a vehicle. The ability of the owner/driver to discourage shootings from his or her vehicle depends on his or her knowledge that a passenger has a loaded firearm. The prohibition expressly requires that the owner/driver know that the passenger possesses a firearm. The same type of proof that is used to establish that the owner/driver was aware of the presence of the firearm, which may be circumstantial evidence, will often be enough to establish that the owner/driver was also aware of the loaded status of the firearm.

Section 26100, subdivision (a) contains an express knowledge requirement. But even where a statute does not contain an express knowledge requirement, the California

14

Supreme Court has continued after *Jorge* to find that knowledge of the characteristics that made possession of an item illegal is required. In 2006, the California Supreme Court considered whether former section 12020, which prohibited the possession of a short-barreled rifle, required proof of the possessor's knowledge of the nature of the weapon. The court concluded that it did. "It is highly unlikely that the Legislature intended that a person possessing an item listed in section 12020(a)(1) for its lawful, utilitarian purpose, but unaware of the characteristic that makes possession of the item illegal, would nevertheless be guilty of violating section 12020(a)(1)." (*People v. King* (2006) 38 Cal.4th 617, 626.) The court noted that "even sawed-off rifles have a lawful purpose, in certain limited circumstances . . . ." (*King*, at p. 626.) Requiring proof of actual knowledge "would not impose an unduly heavy burden on the prosecution, because . . . proving a defendant's knowledge of a short-barreled rifle's illegal characteristic generally will not be too difficult a task." (*King*, at p. 627.) "A person possessing a short-barreled rifle, and having actually observed the weapon, necessarily knows of its shortness, and thus knows its illegal characteristic, whether or not the person knows how many inches long the weapon is." (*King*, at pp. 627-628.)

The California Supreme Court has not retreated from its insistence that criminal statutes generally require knowledge of the facts that make the conduct illegal. "A defendant must know the facts that affect the material nature of his [or her] conduct, that is, the facts that must be proven to show his [or her] act is the kind of conduct proscribed by the statute." (*Stark*, *supra*, 52 Cal.4th at p. 397.) Here, the owner/driver's conduct is proscribed only if the firearm is loaded. We hold that section 26100, subdivision (a) requires proof that the owner/driver knew the facts that made his or her conduct illegal, including that the passenger's firearm was loaded.

Defendant claims that his conviction must be reversed because the prosecution failed to present substantial evidence at trial that he knew the firearm was loaded. We disagree. "Evidence of a defendant's state of mind is almost inevitably circumstantial,

15

but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.) Defendant and his two passengers were fellow members of a criminal street gang, and defendant knew that one of his passengers was carrying a concealed firearm. A gang expert testified at trial that the primary activities of defendant's gang are "[c]arrying concealed firearms, murders, homicides, [and] shooting into inhabited dwellings." He also testified that members of this gang frequently carry guns in vehicles for the purpose of committing crimes. A reasonable jury could have concluded from this evidence that defendant knew that his fellow gang member would not carry a concealed firearm unless it was loaded since the primary purposes to which his fellow gang members put firearms required that those firearms be loaded.

Defendant also contends that the trial court prejudicially erred in failing to instruct the jury that the prosecution was required to prove that he knew the firearm was loaded. The Attorney General's only response to this contention is to repeat her claim that the scope of the knowledge element was limited to knowledge of the firearm's presence. The trial court's instructions completely omitted the aspect of the knowledge element that required proof that defendant knew the firearm was loaded. An instructional error omitting an element of an offense requires reversal unless the prosecution demonstrates that the error was harmless beyond a reasonable doubt. (*People v. Flood* (1998) 18 Cal.4th 470, 504.) The Attorney General does not attempt to do so. Nor could she. In this case, the evidence that defendant knew that John Doe One's firearm was loaded was circumstantial. The prosecution did not present any evidence that defendant had even seen the firearm or that John Doe One or anyone else had told defendant that it was loaded. Had the jury been informed that a conviction required proof beyond a reasonable doubt that defendant knew the firearm was loaded, the jury might have entertained a reasonable doubt as to whether it could reasonably infer that defendant had such

16

knowledge. Hence, the error was not harmless beyond a reasonable doubt. We will therefore remand the matter for a new trial with accurate instructions.

## B. Gang Allegation

Defendant also challenges the sufficiency of the evidence to support the gang allegation. We reach this contention because, if valid, it would preclude retrial of the gang allegation.

The gang allegation required proof that defendant committed the substantive offense (1) "for the benefit of, at the direction of, or in association with any criminal street gang," and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (d).) Defendant does not clearly identify which of these two elements he believes was not established. Instead, he argues: "Though the two elements of the gang enhancement are distinct, courts analyzing the sufficiency of the evidence often do not substantially distinguish between them, effectively considering more generally whether the offense was sufficiently gang-related." Defendant proceeds to argue that the evidence did not establish that his conduct was "gang-related."

The primary thrust of defendant's argument is that the prosecution failed to satisfy the "*'for the benefit of, at the direction of, or in association with'*" element since the specific intent element does not require that the offense itself be "gang-related . . . ." (*People v. Albillar* (2010) 51 Cal.4th 47, 55-56 (*Albillar*).) "'[T]he specific intent to promote, further, or assist in any criminal conduct by gang members'—is unambiguous and applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced." (*Albillar*, at p. 66.) The prosecution need not prove "that the defendant act[ed] with the specific intent to promote, further, or assist a *gang;* the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members.*"

17

(*Albillar*, at p. 67.) To the extent that defendant is challenging the sufficiency of the evidence to support the specific intent element, his challenge is meritless. The evidence easily supports a reasonable inference that defendant intended to assist John Doe One, his fellow gang member, in criminal conduct. Defendant admitted that he agreed to transport John Doe One in his vehicle knowing that John Doe One was carrying a firearm, and there was circumstantial evidence that defendant knew the firearm was loaded. Since John Doe One's act of carrying a loaded firearm in the vehicle was criminal conduct, a reasonable jury could infer that defendant intended to assist John Doe One, a fellow gang member, in this criminal conduct. Such a finding satisfies the specific intent element.

We proceed to defendant's claim that there was insufficient evidence that the substantive offense was committed for the benefit of the gang. Defendant does not challenge the sufficiency of the evidence to support the gang expert's testimony that defendant was a Norteno gang member. Defendant had a history of associating with the Norteno gang and with Norteno gang members. Defendant's cell phone demonstrated his affiliation with his gang. After his arrest, defendant asked to be placed in the jail housing unit for active Norteno gang members. This evidence was sufficient to show that defendant was a Norteno gang member.

Defendant claims that the evidence was insufficient to support the gang expert's testimony that the substantive offense was committed for the benefit of the gang. The gang expert testified at trial that the primary activities of the Norteno gang are "[c]arrying concealed firearms, murders, homicides, [and] shooting into inhabited dwellings." He opined that Norteno gang members "enhance their reputation by committing crimes and carrying guns. Carrying guns bolsters one's status amongst the gang, as well as it makes the gang feel stronger." The gang expert explained that Norteno gang members frequently carry guns in vehicles for the purpose of committing crimes. He concluded that "a Norteno affiliate who allows another gang member to carry a loaded weapon in the car act[s] for the benefit of, at the direction of or in association with the criminal

18

street gang in order to promote, further or assist in any criminal conduct by other gang members." The gist of the expert's testimony was therefore that the carrying of a gun in a vehicle by a gang member benefits the gang by "mak[ing] the gang feel stronger" and facilitating the commission of gang crimes.

Defendant relies on *In re Frank S.* (2006) 141 Cal.App.4th 1192 (*Frank S.*) to support his claim that there was insufficient foundation for the gang expert's testimony. Frank was stopped by police after he ran a red light on his bicycle. He gave a false name, and the officer found a concealed knife, a bindle of methamphetamine, and a red bandana in Frank's possession. (*Frank S.*, at p. 1195.) Frank admitted that he carried the knife to protect himself against "'Southerners,'" as he was allied with northern street gangs. (*Ibid.*) A gang expert was permitted to testify that Frank's possession of the knife benefitted the gang because "'it helps provide them protection should they be assaulted by rival gang members.'" (*Frank S.*, at p. 1199.) The Fifth District deemed this improper because, in its view, the expert opinion was not supported by any other evidence. "The prosecution did not present any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense." (*Ibid.*) *Frank S.* is readily distinguishable. Here, the substantive offense involved a group of three fellow gang members who were headed for a known gang hangout area with a loaded firearm. Their gang's primary activities revolved around the use of firearms. This evidence provided sufficient support for the gang expert's testimony that the carrying of the loaded firearm was for the benefit of the gang.

Defendant also relies on *People v. Ramon* (2009) 175 Cal.App.4th 843. Ramon, a gang member, was stopped by police in his gang's territory while driving a stolen truck. A fellow gang member was his passenger, and an unregistered firearm was found under the driver's seat. (*Id*. at pp. 846-847, 849.) The prosecution's gang expert testified at trial that the stolen truck and the unregistered firearm could be used to commit gang crimes. (*Id*. at p. 847.) He offered an opinion that possession of a gun and driving of a

19

stolen truck in gang territory therefore benefitted the gang. (*Id.* at p. 848.) The expert testified that stolen trucks and firearms were "tools" that the gang needed to commit other crimes. (*Ibid.*) The Fifth District concluded that the case could not be "distinguished in a meaningful manner" from *Frank S.* and found the expert's testimony "improper." (*Id.* at p. 851.) "The People's expert simply informed the jury of how he felt the case should be resolved. This was an improper opinion and could not provide substantial evidence to support the jury's finding. There were no facts from which the expert could discern whether Ramon and Martinez were acting on their own behalf the night they were arrested or were acting on behalf of [their gang]. While it is possible the two were acting for the benefit of the gang, a mere possibility is nothing more than speculation. Speculation is not substantial evidence." (*Ibid.*)

We find *People v. Ramon* distinguishable. The gang expert here, unlike the expert in *People v. Ramon*, did not premise his opinion solely on his understanding that the stolen truck and the firearm *could* be used by the gang to commit crimes. His opinion had a much more substantial basis. One, defendant's gang's primary activities included carrying firearms and, in fact, revolved around firearms. Two, when the firearm was found in John Doe One's possession in defendant's vehicle, defendant was transporting both John Doe One and a third member of the same gang to a location where that gang hung out. Three, the firearm was stolen. The gang expert testified that stolen firearms are particularly useful to a gang because such firearms cannot be traced back to their owners. It might be true that individually none of these facts would have been sufficient to support the expert's opinion, but the combination of these facts was an adequate predicate for the gang expert's opinion that the substantive offense was committed to benefit defendant's gang.

Since the prosecution presented substantial evidence in support of the gang allegation, it may retry that allegation.

20

### III. Disposition

The judgment is reversed.

_____
Mihara, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P. J.




_____
Márquez, J.

22

Trial Court:                                   Monterey County Superior Court


Trial Judge:                                   Honorable Pamela L. Butler


Attorney for Defendant and Appellant:          Patrick McKenna
                                               Under Appointment by the Sixth District
                                               Appellate Program


Attorneys for Plantiff and Respondent:         Kamala D. Harris
                                               Attorney General of California

                                               Dane R. Gillette
                                               Chief Assistant Attorney General

                                               Gerald A. Engler
                                               Senior Assistant Attorney General

                                               Catherine A. Rivlin
                                               Supervising Deputy Attorney General

                                               Allen R. Crown
                                               Deputy Attorney General