Filed 6/13/16  P. v. Lepe CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B264589 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA111293) |
| v. | |
| ESTEVAN LEPE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Raul A. Sahagun, Judge.  Affirmed in part, reversed in part, and remanded for resentencing.

Mark David Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven E. Mercer and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendant and appellant Estevan Lepe of first degree murder (Pen. Code, § 187, subd. (a)[1]), kidnapping (§ 207, subd. (a)), first degree burglary (§ 459), and evading an officer (Veh. Code, § 2800.2, subd. (a)). As to the murder, the jury found true the allegations that defendant committed the murder while engaged in the crimes of burglary and kidnapping; as to the murder and kidnapping, the jury found true the allegations that a principal personally used and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (b)-(d), & (e)(1)); and as to each of the offenses, the jury found true the allegations that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subds. (b)(1)(A)-(C)[2]) (gang enhancements).[3] The trial court sentenced defendant to life in prison without the possibility of parole plus 25 years to life.

On appeal, defendant contends that insufficient evidence supports the gang enhancements as to the murder and kidnapping, the trial court's failure to bifurcate the trial on the gang allegations resulted in a fundamentally unfair trial, and the trial court abused its discretion in permitting the prosecution to introduce a recording of his jail cell conversation with Baeza in its rebuttal case. We reverse the gang enhancements and the sentences on the personal firearm use enhancements and remand for resentencing. We otherwise affirm the judgment.

---

[1] All statutory citations are to the Penal Code unless otherwise noted.

[2] Section 186.22, subdivision (b)(1)(C) as to the murder and kidnapping convictions, subdivision (b)(1)(B) as to the burglary conviction, and subdivision (b)(1)(A) as to the evading an officer conviction.

[3] Defendant was tried in a first trial with codefendants Noe Baeza and Robert Benavidez. The jury in that trial convicted Baeza and Benavidez of first degree murder, kidnapping, first degree burglary, and being felons in possession of firearms. We affirmed those convictions in case number B245457. The jury in that case was unable to reach a verdict as to defendant, and the trial court declared a mistrial.

## BACKGROUND

### I.      The Prosecution's Evidence

At trial, the prosecution introduced evidence concerning the abduction and killing of Arturo Alvarez, a member of the 38th Street gang.  Alvarez, his wife Erica Castro, their two children, and Alvarez's parents lived in a house on Kauffman Avenue in South Gate.  About 12:45 a.m. on July 7, 2009, Alvarez, Castro, and their children were asleep in the living room when they were awakened by banging on the front door.  Someone yelled, "Open the door FBI."  Alvarez, Castro, and their children went to one of the bedrooms.

From the bedroom, Castro heard more banging and two or three gunshots.  Two men wearing masks entered the bedroom.  They were armed with firearms.  The men ordered Alvarez and his family to "[g]o to the floor."  The men picked up Alvarez from the floor.  A third man entered the room.  Alvarez's mother also entered the room.  The three men told Alvarez's mother that her son was a "fugitive of the law."  The men told Alvarez to put his hands behind his back and took him out of the room.  One of Alvarez's abductors said, "We got suspect."  Castro heard a "chirping" sound that made her believe her husband's abductors had radios.  She believed they were police officers.  At some point, Castro got up from the floor and went to the living room.  No one was there.  Less than a minute later, the "real" police arrived.

Rudy Dominguez lived on Kauffman Avenue.  About 12:45 a.m. on July 7, 2009, he was watching television when he heard banging on a neighbor's door.  He heard a gunshot and went outside.  Dominguez saw a man run out of Alvarez's house and to a van parked a couple of houses away.  The man "brought the van around," and three people exited the Alvarez house and got into the van.  The van drove away on Michigan towards Atlantic.

About 12:45 a.m. on July 7, 2009, South Gate Police Department Officer Robert Pellerin was in his police car when he received a radio call of shots being fired in the area of Kauffman Avenue.  He responded to the area and began to look for vehicles leaving the area.  According to the radio call, a witness reported that a silver or tan pickup or van

3

left the area immediately after the shooting. Pellerin saw a gold Honda van at the intersection of Michigan and Atlantic traveling from the direction of the shooting. He followed the van onto the 710 freeway. Traffic was very light and the officer pulled his car up next to the van. There was about one lane between the vehicles. Pellerin tried to look inside the van. He aimed his spotlight at the driver's side of the van. The driver's window was rolled down. Pellerin saw the van's driver, and identified defendant at trial as the driver. The van transitioned onto other freeways before exiting on Rosecrans. When the van reached Broadway and 125th Street, it slowed to 15 miles per hour and a man exited the van.

Pellerin activated his emergency lights and siren, but the van did not slow down. Instead, it accelerated. When the van reached the intersection of Spring and 123rd Street, the van again slowed to 15 miles per hour and a second man exited the van. The parties stipulated at trial that the second man who exited the van was Benavidez. The van traveled to Los Angeles and 124th Streets where the van slowed and a third person exited the van.

Pellerin continued his pursuit of the van. The van failed to obey stop signs or traffic lights, performed illegal U-turns, and reached speeds approaching 100 miles per hour. When the van reached 55th and Figueroa, it slowed and a fourth person exited the van. The parties stipulated at trial that the fourth person who exited the van was Baeza.

At that point, a California Highway Patrol unit employed a technique called a "pit maneuver" to stop the van during the pursuit. When the van was stopped, its driver got out and ran northbound. Pellerin armed himself with his patrol rifle and approached the van to "clear" it and to search for the victim. He opened the back of the van and found Alvarez. Alvarez's hands and feet were zip tied behind his back, and there was duct tape around his face. Alvarez was bleeding from what appeared to Pellerin to be a fatal gunshot wound to his head.[4]

---

[4] Deputy Medical Examiner Dr. Kevin Young performed an autopsy on Alvarez's body. He testified that Alvarez suffered two gunshot wounds to his head. Each wound was fatal.

While Pellerin cleared the van, California Highway Patrol Officer Isaac Subia pursued the driver on foot. Los Angeles Police Department helicopter pilot Officer Rudy Villareal, who had monitored the pursuit of the van, monitored Subia's pursuit of the driver. Villareal illuminated the driver with the helicopter's "night sun" equipment which he described as a "big flashlight." Villareal never lost sight of the driver. The driver ran between a number of houses and entered the house at 711 West 55th Street. Police officers surrounded the house to contain its occupants. Twelve persons, including defendant, were removed from the house. Eight of those persons shared defendant's surname.

Los Angeles Police Department Officer Bryan Schilling testified as the prosecution's expert on gangs generally and on the 38th Street gang specifically. He testified that the 38th Street gang had between 400 and 450 members who had common signs and symbols and claimed a particular territory. The gang's primary activities were sales of cocaine and rock cocaine; vehicle, residential, and commercial burglary; attempted murder; murder; and home invasion. Schilling identified two predicate gang offenses to establish a pattern of gang activity.

According to Schilling, gang members sometimes commit crimes against members of their own gang. Two of the most common reasons for such crimes are "snitching" and stealing from another gang member or his family. The officer explained that every gang has rules of conduct and its members are expected to act respectfully towards other members of their gang. If a gang member violates the rules of conduct or is disrespectful towards a fellow gang member, the potential consequences include a tax—a monetary payment, battery, and murder.

Alvarez's gang moniker was "Crook." Alvarez had various tattoos that signified his membership in the 38th Street gang. Schilling opined that Baeza was a member of 38th Street on July 7, 2009.[5]

---

5    On March 19, 2013, Art Valenzuela, a Los Angeles County Sheriff's Department custody assistant at the Twin Towers correctional facility, retrieved from Baeza's

5

Schilling testified that gang members sometimes commit crimes with non-gang members, using the non-members as drivers or lookouts. The primary reason for using a non-gang member—someone who did not "fit the description of a gang member," who had a valid driver's license, and whose car registration and insurance were up-to-date—is to avoid detection by law enforcement.

The prosecutor gave Schilling a set of hypothetical facts based on the facts in this case and asked whether the homicide, kidnapping, burglary, and evasion were committed for the benefit of, at the direction of, or in association with a criminal street gang. Schilling responded that those offenses would have benefited the gang primarily because they would show that the "gang has no boundaries. It is willing to take out one of his own gang members for reasons that this gang member has done to the gang." The offenses would instill fear in other members of the gang, in that they would show that action would be taken against a gang member who failed to uphold the gang's rules and boundaries. Schilling's opinion would not change if there was no evidence the driver of the van was a 38th Street gang member. According to Schilling, the offenses also would send a message to other gangs that the 38th Street gang was violent and willing to kill one of its own members who "must have violated [this gang's rules] at some point."

## II. The Defense's Alibi Evidence

Defendant presented alibi evidence in his defense. Eric Lepe (Eric), defendant's brother, testified that he lived with defendant on July 7, 2009. During the late evening on July 6, 2009, Eric saw defendant "around the house" as Eric was performing chores. After midnight, Eric heard police sirens. He went outside to the front of the house to see what was happening. He came back in the house and went to a back room where his sister-in-law, Estella Lepe (Estella), was watching television with defendant. Eric asked

property bin a "roll call" which is a roster of the inmates in a particular housing area at the jail. The roll call indicated that Baeza was a member of the 38th Street gang.

6

them to turn to the news to see what was happening outside. Shortly thereafter, the police detained Eric, defendant, and Estella.

Estella corroborated defendant's alibi. According to Estella, she and defendant were watching television together when she heard sirens in the early morning on July 7, 2009. Omar Carbajal, who also lived with defendant, also corroborated defendant's alibi. He testified that he saw defendant in the television room on July 6, 2009, just before midnight. Between midnight and 1:30 a.m. on July 7, 2009, Carbajal spoke with his girlfriend in front of the house—apparently in a parked vehicle. Carbajal did not see defendant leave the house while Carbajal was in front of the house. When Carbajal's girlfriend left around 1:30 a.m., Carbajal went back inside the house and saw defendant. Shortly thereafter, Carbajal heard sirens.

During the early morning on July 7, 2009, defendant's neighbor, Dorothy Lowe, was awakened by police sirens. Lowe looked out her window and saw a van. She also saw a man run down her driveway and through her backyard. It was dark outside, and she did not see the man's face. Based on the man's profile and body type, the man did not look like defendant—he appeared to be a little shorter than defendant.

Patricia Guerra, also defendant's neighbor, was awakened by sirens on July 7, 2009, and looked out of her window. Guerra saw someone run from her driveway towards the street. Guerra could not see the person's face, but was certain the person she saw running was not defendant. The person she saw running was a little bit shorter than defendant.

## III.    The Prosecution's Rebuttal Evidence

Los Angeles County Sheriff's Department Detective Wayne Holston caused defendant to be placed in a jail cell with Baeza. Defendant's conversation with Baeza was recorded and the recording was played for the jury.

Soon after defendant was left alone with Baeza, defendant said to Baeza, "I don't know you, that's the way it is (unintelligible)." Baeza responded, "No but we just meet

yesterday." Defendant said, "Today. . . . [¶]-[¶] I just meet you right now." Baeza responded, "Sure." Defendant asked, "You said you knew me?" Baeza responded, "No."

Defendant asked Baeza, "They also have the other guy?" Baeza responded, "Uh, yeah." Baeza asked defendant, "Did you speak to the detectives?" Defendant responded, "Yes, they talked with me. [¶]-[¶] They did not get me in the car." He added, "No, they didn't see me get out of the car."

Defendant said to Baeza, "I have it made guy." Baeza responded, "Yeah, I don't know you." Defendant said, "Yeah, that's what I am telling you." Defendant said, "Because somebody said they knew me. . . . I think somebody said they knew me." Baeza said he had not spoken with anyone and advised defendant to request a lawyer the next time the detectives wanted to speak with him.

Defendant told Baeza he said to the detectives, "I did not know anything that I was not in the car." Defendant said, "I was not in the car, I don't even know what they are talking about, dude. There was a big mess in front of my house. I didn't even go out, dude, I peeked out. I heard friends saying I shouldn't go out and I went back in. I was in the house all day."

Baeza said, "[T]hey took our clothes to test it to see if there is any blood or gun powder I guess something." Defendant replied, "But are they going to screw you over guy[?]" Baeza said he did not know.

Baeza said to defendant, "Do you understand me? Defendant responded, "And me. You." Baeza said, "So you were at your house kicking back with your family." Defendant responded, "I was with my family guy in the room with my brother-in-law when we hear the helicopter go brum—and we went to look out guy."

Later, defendant said, "They interrogated my whole family fool—and I was the second to the last fool as soon as I went in there the bitch was like, I know it was you this and that and I said whatever cause I seen fool that when they take me fool—I am innocent homie. Do you understand guy? 'Cause as soon as I went out fool the cops seen me fool and they were like—no that is not him the one that ran from us. Do you understand?"

8

Baeza responded, "So, don't say anything just wait for the lawyer. You know what I mean, when you call home, hum tell them that they are going to have to say that you were there at the house the whole time. You know what I mean?"

Later, Baeza said, "'Cause if you were home with your family you know probably the guy got away you know probably did run thru your house fool. Who knows? [¶]-[¶] . . . Because that's the salvation, because you were at your house. [¶]-[¶] No, I'm telling you, you are the savior of all of us of all of us." Defendant asked, "How?" Baeza responded, "Yeah, because you were at your house. Do you understand? Just relax and calm down. Do you understand?" Defendant replied, "No, don't worry me guy."

Baeza again advised defendant to request a lawyer if the detectives attempted to speak with him. Defendant responded, "He was here . . . ." Baeza replied, "Then, I tell you right now that we go that way that you call your house." Defendant responded, "Uhum." Baeza said, "Then it's the most important. Do you understand? Whoever was there with you your brothers all night." Defendant responded, "Uhum." Baeza said, "He can be the main witness. That he was there. Do you understand? If not they are going to [violate] your rights homie." Defendant responded, "Uhum."

Baeza told defendant that they would be moved to a larger cell that was equipped with a telephone and "[r]ight there you are going to have a chance to call home." Later, Baeza said, "Well, when you talk to your family you tell them, well, that they should say that you were at home, you know what I mean? That you were there, that you were at home." Defendant responded, "Uhum." Baeza said, "Because that's going to be the most important thing. If not these asshole's are going to put all on you."

## DISCUSSION

### I.     The Jury's Gang Allegation Findings

Defendant contends that insufficient evidence supports the jury's true finding on the gang allegations. We agree.

9

*A.     Standard of Review*

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 [82 Cal.Rptr.3d 323, 190 P.3d 664].)  We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].)  In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].)"  (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict.  [Citation.]"  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  We review a claim that insufficient evidence supports a jury's gang allegation finding under the same standard of review.  (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 321-322.)

*B.     Application of Relevant Principles*

The gang enhancement in section 186.22, subdivision (b)(1) consists of two prongs that require the prosecution to prove the defendant committed the charged offense (1) "for the benefit of, at the direction of, or in association with any criminal street gang," and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (*People v. Gonzales* (2015) 232 Cal.App.4th 1449, 1464.)  As to the first prong, "'[e]xpert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement.  [Citation.]"  (*People v. Vang* (2011) 52 Cal.4th 1038, 1048; *People v. Albillar* (2010) 51 Cal.4th 47, 63 ["Expert opinion that particular

10

criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[ ] criminal street gang' within the meaning of section 186.22[, subdivision] (b)(1)"].) A gang expert's testimony alone—i.e., without evidentiary support—however, is insufficient to find an offense gang related. (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657; *People v. Ramon* (2009) 175 Cal.App.4th 843, 851 [gang enhancement reversed where "[t]here were no facts from which the expert could discern whether [defendants] were acting on their own behalf . . . or were acting on behalf of the [gang]. While it is possible the two were acting for the benefit of the gang, a mere possibility is nothing more than speculation."]; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199 [gang enhancement reversed where "the prosecution presented no evidence other than the expert's opinion regarding gangs in general" and the expert's "opinion on the ultimate issue"].)

The second prong "applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced." (*People v. Albillar, supra,* 51 Cal.4th at p. 66.) That is, the "any criminal conduct by gang members" provision in the second prong includes the current or charge offenses. (*Id.* at pp. 65-66.) Moreover, there is no "requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*." (*Id.* at p. 67.)

Schilling's testimony does not provide sufficient evidence to support the first prong necessary for the gang enhancement. Schilling offered two reasons gangs retaliate against their own members: "snitching" and stealing from another gang member or his family. Because there was no trial evidence that established that Alvarez snitched or stole from another gang member or his family, there is no evidence to support the jury's true findings on the gang allegations. (*People v. Ochoa, supra,* 179 Cal.App.4th at p. 657; *People v. Ramon, supra,* 175 Cal.App.4th at p. 85; *In re Frank S., supra,* 141 Cal.App.4th at p. 1199.) As the section 12022.53 enhancement on the murder and

11

kidnapping depended on the jury's true findings on the gang allegations under section 186.22, subdivision (b), we also reverse those sentences and remand the matter for resentencing.

## II. Fundamental Unfairness from Evidence in Unitary Trial

Defendant concedes that the trial court did not abuse its discretion in denying his motion to bifurcate trial of the gang allegations based on the evidence the prosecutor said she would present, but contends that the failure to bifurcate resulted in a fundamentally unfair trial when the prosecutor failed to present the proffered evidence and the gang evidence adduced at trial was insufficient to support the gang allegations, yet was highly prejudicial on the issue of guilt. Defendant's trial was fair.

### A. Background

Prior to trial, defense counsel moved to bifurcate trial of the gang allegations from trial of the charged offenses, arguing that gang evidence is highly prejudicial and there was little or no evidence that defendant was a gang member or that the offenses were gang related. In her motion, defense counsel stated that Baeza testified in the prior trial that he was asked to assist in kidnapping Alvarez to obtain information from Alvarez on the whereabouts of a kidnapping victim. She stated, "It was believed that Mr. Alvarez was involved in the kidnapping of an old friend's son, Daniel, and that Daniel was held hostage somewhere in Mexico."

At the hearing on the motion to bifurcate, defense counsel argued there was a risk that the jury would infer defendant was involved in gang activities even though no evidence would be adduced that he was a gang member. Defense counsel argued that the heart of the case was identification—i.e., whether defendant was the driver of the van.

The prosecutor argued that any gang evidence adduced was unlikely inflammatory compared with the facts underlying the murder charge. The trial court asked if the prosecution's theory of the case was that the crimes were gang related. The prosecutor responded that all of the offenses were "related to a 38th Street gang member" and that

12

Baeza, a 38th Street gang member, would testify that "Alvarez was involved in a kidnapping, to use a gang term, Big Homey of 38th Street, a high-ranking member of the gang, and the kidnapping of Mr. Alvarez was for the purpose of obtaining information to try to locate the son of the Big Homey that was kidnapped." The trial court found gang evidence to be "inextricably intertwined with the motive of the case," and denied the motion to bifurcate. Baeza, however, did not testify at trial.

### B. Application of Relevant Principles

Defendant concedes that the trial court's decision not to bifurcate was not erroneous in that it was based in part on Baeza's proffered testimony. As Baeza did not testify at trial, however, defendant advances the argument that the remaining evidence that the prosecution offered—which inherently could not have been more incriminating than that same evidence in combination with the proffered Baeza testimony—created an unfair trial.

This claim is essentially a direct challenge to the admission of the gang evidence in the unitary trial. "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) "To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and

13

fundamentally unfair' that it violated federal due process." [Citations.]' [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229-230.)[6]

The denial of defendant's motion to bifurcate and the admission of the gang evidence did not result in a fundamentally unfair trial. First, the gang evidence was relevant and admissible to establish defendant's motive for the crimes independent of Baeza's proffered testimony. (*People v. Albarran, supra,* 149 Cal.App.4th at pp. 223-224.) Second, the gang evidence was not of such a quality that it necessarily prevented a fair trial. (*Id.* at p. 229.) The gang evidence adduced at trial—Schilling's and Valenzuela's testimony—was straight forward and not particularly inflammatory compared to the facts of the charged offenses—the invasion of the Alvarez home in which Alvarez was abducted at gunpoint in front of his family, bound, and shot in the head twice. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051 [a trial court does not abuse its discretion in denying a motion to bifurcate gang allegations when the gang evidence "was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of [the] defendant['s] actual guilt"].) Moreover, the evidence of defendant's guilt was strong. Pellerin, an eyewitness, identified defendant as the van's driver. Defendant participated in a jail cell conversation with Baeza in which defendant made incriminating statements—referring to a conversation with detectives, defendant said to Baeza, "They did not get me in the

---

**6** Defendant asks us to analyze the effect of the admission of the gang evidence consistent with an approach the California Supreme Court has used in joinder and severance cases. With respect to the joinder of counts, the Supreme Court has "held that even if a trial court's ruling on a motion to sever is correct at the time it was made, a reviewing court still must determine whether, in the end, the joinder of counts or defendants for trial resulted in gross unfairness depriving the defendant of due process of law." (*People v. Rogers* (2006) 39 Cal.4th 826, 851, citing, inter alia, *People v. Mendoza* (2000) 24 Cal.4th 130, 162.) Defendant contends we should apply that analytical framework to his claim that the trial court's denial of his motion to bifurcate the gang allegations resulted in a fundamentally unfair trial even though the trial court's ruling was not an abuse of discretion when made. We need not decide whether to import these cases here, because, as indicated above, defendant's claim boils down to a challenge that the admission of the gang evidence here created a fundamentally unfair trial.

14

car. . . . [T]hey didn't see me get out of the car"—and in which he and Baeza contrived an alibi, thereby demonstrating a consciousness of guilt. Accordingly, defendant's trial was fair.

## III. Rebuttal Evidence

Defendant contends that the trial court abused its discretion in permitting the prosecution to introduce a recording of defendant's jail cell conversation with Baeza because the recording could have been introduced in the prosecution's case-in-chief, and thus was improper rebuttal evidence. The trial court acted within its discretion in permitting the prosecution to introduce the recording.

### A. Standard of Review

We review a trial court's admission of rebuttal evidence for an abuse of discretion. (*People v. Young* (2005) 34 Cal.4th 1149, 1199.) A trial court abuses its discretion when it "'exercise[s] its discretion in an arbitrary, capricious, or patently absurd manner that result[s] in a manifest miscarriage of justice.'" (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.)

### B. Application of Relevant Principles

"'[P]roper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt.'" (*People v. Young, supra,* 34 Cal.4th at p. 1199, quoting *People v. Carter* (1957) 48 Cal.2d 737, 753-754.) "[W]hen a defendant presents an alibi defense, the prosecution may introduce evidence that rebuts it even though that evidence could have been introduced as part of the case in chief. [Citation.]" (*People v. Orabuena* (1976) 56 Cal.App.3d 540, 543-544.)

In its case-in-chief, the prosecution relied on Pellerin's identification of defendant as the driver of the car, and the discovery of defendant in the house into which the driver fled, in order to tie defendant to the crime. Thereafter, defendant introduced an alibi defense through testimony from Eric, Estella, and Carbajal that defendant was at home at the time the charged offenses were committed. The prosecution's rebuttal evidence consisted of the recording of defendant's jail cell conversation with Baeza in which defendant and Baeza contrived the alibi defense that defendant was home at the relevant time and that defendant's family members and "[w]hoever" would attest to the fact that defendant was home. Relying on *People v. McDowell* (1965) 234 Cal.App.2d 54, 56-58[7] for the proposition that consciousness of guilt evidence is admissible in a prosecution's case-in-chief, defendant argues the recorded jail cell conversation was inadmissible as rebuttal evidence because it was "clearly and unequivocally evidence of consciousness of guilt" and thus admissible in the prosecution's case-in-chief. However, evidence is admissible to rebut an alibi defense even when such evidence could have been admitted as part of the prosecution's case-in-chief. (*People v. Orabuena, supra,* 56 Cal.App.3d at pp. 543-544.) Here, the trial court had reason to conclude as it did that the prosecution did not "have to present evidence in anticipation of a possible defense, which they don't know whether it is going to be presented or not. [¶] Once it is presented they can present the rebuttal of evidence." Accordingly, the trial court acted within its discretion in admitting the rebuttal evidence. (*People v. Ledesma, supra,* 39 Cal.4th at p. 705; *People v. Young, supra,* 34 Cal.4th at p. 1199.) Because the trial court did not abuse its discretion in admitting the recorded conversation, we need not address defendant's prejudice arguments.

---

[7] *People v. McDowell, supra,* 234 Cal.App.2d 54 was disapproved on another ground in *People v. Williams* (1965) 63 Cal.2d 454, 460, footnote 8.

## DISPOSITION

The gang enhancements under section 182.22 and the sentences on the personal firearm use enhancements under section 12022.53 are reversed and the matter is remanded for resentencing. The judgment is otherwise affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


RAPHAEL, J.*


We concur:


TURNER, P. J.


KRIEGLER, J.

---

*        Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17