Filed 11/2/21 P. v. Alvarez CA4/2
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E072886 |
| v. | (Super.Ct.No. INF1501680) |
| ENRIQUE VILLA ALVAREZ et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County. Johnnetta E. Anderson, Judge. Affirmed as modified, remanded with directions.

Patricia M. Ihara, under appointment by the Court of Appeal, for Defendant and Appellant, Enrique Alvarez.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant Martin Gutierrez Jr.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine L. Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendants and appellants Martin Gutierrez, Jr. and Enrique Villa Alvarez were convicted on charges arising from two separate shootings, including one count of murder and one count of attempted murder. Gutierrez received an indeterminate sentence of 85 years to life, plus a determinate sentence of 13 years and four months; Alvarez was sentenced to 40 years to life.

On appeal, both defendants argue that (1) the trial court erred by excluding from evidence expert testimony regarding eyewitness identification errors in other cases that led to wrongful convictions, reversed later after exoneration by physical evidence; (2) the trial court erred by denying Gutierrez's motion to sever counts related to the attempted murder from those related to the murder; and (3) the jury's true findings on gang enhancements of count 1 for each defendant were not supported by substantial evidence. Gutierrez argues separately that (1) his convictions for the murder and attempted murder were not supported by substantial evidence because the eyewitness identifications inculpating him were unreliable; and (2) a one-year term imposed on him for a prison prior enhancement must be stricken pursuant to Senate Bill No. 136 (Sen. Bill 136) (Stats. 2019, ch. 590, § 1). Alvarez argues separately that (1) his trial counsel provided ineffective assistance of counsel by failing to move to suppress his statement to police, which he contends was obtained in violation of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); (2) the model instruction given to the jury on eyewitness identifications, CALCRIM No. 315, improperly allows the jury to consider the

2

eyewitness's confidence in the identification; and (3) the cumulative error doctrine applies.

In an unpublished opinion filed December 4, 2020, we rejected most of defendants' arguments, agreeing with Gutierrez that the prison prior enhancement of his sentence should be stricken pursuant to Sen. Bill 136, but otherwise affirming the judgments. The California Supreme Court granted Alvarez's petition for review, deferring consideration and disposition until it decided a related issue in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). In August 2021, our Supreme Court transferred the matter to us with directions to vacate our prior opinion and reconsider this appeal in light of *Lemcke*. Accordingly, we vacated our December 4, 2020 opinion and invited the parties to submit supplemental briefing, which Alvarez and the People have done.

After reconsidering the matter in light of *Lemcke*, we reach the same conclusions as our prior opinion. We agree with Gutierrez that the prison prior enhancement of his sentence should be stricken pursuant to Sen. Bill 136. Otherwise, we affirm the judgments.

## I. BACKGROUND

On the evening of August 11, 2015, V.A. was standing outside his apartment smoking a cigarette when he was approached by three men. According to the prosecution, Gutierrez was one of those three men. Gutierrez asked V.A. "'where are you from'" and "'what do they call you.'" V.A. responded by saying something like "'What do you mean? Who are you?'" Gutierrez said "'Do you want to go that route?'"

3

Gutierrez then pulled out a handgun and started shooting at V.A. V.A. sustained five gunshot wounds, to his back, leg, and neck, but survived.

On the evening of September 22, 2015, J.C., together with three friends, was drinking alcohol and smoking marijuana while sitting outside of the office of the same apartment complex where V.A. had been shot the month before. They were approached by three men; according to the prosecution, Gutierrez and Alvarez were two of those three men. Gutierrez told J.C. to "get up." J.C. ignored him. Gutierrez then told one of J.C.'s friends to "move"; she did. Alvarez then pulled out a gun and began shooting at J.C., hitting him eight times in the head, chest, and arms, killing him.

The prosecution presented evidence that the apartment complex where the shootings both took place is within territory claimed by the Barrio Mecca Vineyards criminal street gang. Indeed, the gang takes its name from the former name of the apartment complex and it was initially formed there, though it has since expanded its turf. Alvarez is an admitted member of the gang. The prosecution's theory of the case was that Gutierrez, too, is an active member, though he has argued otherwise.

Defendants were tied to the shootings by eyewitness identifications. Two of the three people with J.C. at the time of that shooting identified Alvarez as the shooter and Gutierrez as the person who demanded that J.C. "stand up" before the shooting. The third person accompanying J.C. saw that the people who approached their group were Hispanic males and observed some of their physical characteristics, but claimed that he did not look at their faces. V.A. identified Gutierrez as the person who had shot him.

4

V.A. knew Alvarez a little bit through previous, innocuous interactions, and he had seen Alvarez with Gutierrez a few days before the shooting. He testified unequivocally that Alvarez was not one of the two other men who accompanied Gutierrez the night of the shooting. Forensic examination of recovered bullet casings showed that the same firearm was used in the August 2015 shooting of V.A. and the September 2015 shooting of J.C.

Both defendants claimed that they were misidentified. After a series of other stories, Alvarez eventually told police that he was walking alone elsewhere in the apartment complex when J.C. was shot, and that he heard the gunshots and he saw two individuals running away. He claimed that at the time he did not know who had been shot or who did the shooting, and he denied any involvement. Gutierrez denied having been at the apartment complex at the time of either shooting, and he presented some alibi evidence in support of that proposition at trial.

In connection with the September 2015 shooting, Gutierrez and Alvarez were both charged with murder (Pen. Code,[1] § 187, subd. (a), count 1), and Gutierrez was charged with being a felon in possession of a firearm (§ 29800, subd. (a)(1), count 2). In connection with the August 2015 shooting, Gutierrez was charged with attempted murder (§§ 187, 664, count 3) and a second count of being a felon in possession of a firearm (§ 29800, subd. (a)(1), count 4). Alvarez was not charged in connection with the August 2015 shooting. The information also alleged various gang, firearms, and recidivism based enhancements.

---

[1] Further undesignated statutory references are to the Penal Code.

5

On count 1, the jury found both Gutierrez and Alvarez guilty of second degree murder. On count 1, it found a gang enhancement (§ 186.22, subd. (b)(1)(c)) true as to both defendants, and it found an enhancement for personally discharging a firearm causing great bodily injury or death (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8)) true only as to Alvarez. It found Gutierrez guilty on counts 2, 3, and 4, finding true gang enhancements (§ 186.22, subd. (b)(1)(c)) of each of those counts, as well as an enhancement of count 3 for personally discharging a firearm causing great bodily injury (§§ 12022.53, subd. (d), 1197.7, subd. (c)(8)). Gutierrez admitted a prior strike allegation (§§ 667, subds. (c) & (e), 1170.12, subd. (c)(1)), a prior serious felony allegation (§ 667.5, subd. (a)), and a prison prior allegation (§ 667.5, subd. (b)).

The trial court sentenced Gutierrez to 85 years to life, plus 13 years and four months, the maximum possible sentence. As relevant here, Gutierrez's sentence includes a one-year term for the prison prior enhancement. The trial court sentenced Alvarez to 40 years to life.

## II. DISCUSSION

A. *Exclusion of Expert Testimony*

At trial, the defense presented testimony from an expert witness, a research psychologist specializing in memory in the context of investigative interviews. Before the expert testified, the prosecution moved to exclude "any discussion of the Innocence Project" or the expert's work with the Innocence Project, and specifically any discussion of "select cases" involving erroneous eyewitness identifications. The defense proposed

6

that, even though the Innocence Project itself was not directly relevant, the expert should be permitted to testify that there have been a number of cases in which eyewitness identifications were the only evidence connecting the defendant to the charged offense, "and it later turned out that those identifications were factually inaccurate." The trial court sided with the prosecution and excluded such testimony.

In this appeal, defendants contend that the expert should have been permitted to testify "related to the context surrounding identification errors," including that "over 400 convictions in California alone based on faulty identifications have been reversed after exoneration by physical evidence," often after the defendant has been in prison for many years. We find no abuse of the trial court's discretion.

In *People v. McDonald* (1984) 37 Cal.3d 351 (*McDonald*), our Supreme Court held that "[w]hen an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony." (*Id.* at p. 377.) The Court found that the trial court in that case had erred by excluding "in wholesale fashion" the entirety of a defense expert's testimony. (*Id.* at p. 372.) The Court also emphasized, however, that its holding was not intended to ""'open the gates'"" to any and all evidence related to eyewitness identifications, and the decision to admit or exclude expert testimony on the issue

7

"remains primarily a matter within the trial court's discretion." (*Id*. at p. 377; see Evid. Code, § 352.) Under the abuse of discretion standard, we disturb the trial court's ruling only if the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Clark* (2016) 63 Cal.4th 522, 572.)

Here, the trial court's ruling regarding expert testimony on eyewitness identifications was well within the scope of its discretion. The expert was permitted to testify at length on how memory works and the various factors that bear on the accuracy of eyewitness identifications, both generally and with reference to the specific circumstances of this case. Indeed, there is hardly any aspect of the several identifications of the defendants reflected in *this* record about which she did not opine, either directly or through the multitude of hypotheticals posed by defense counsel. Her testimony was limited only in that she could not make specific reference to *other* cases involving identifications that may or may not have been similar to those in this case, where it turned out the identifications were mistaken.

In our view, the excluded testimony would have had minimal if any probative value, would have created a substantial danger of confusing the issues, and may well have derailed the proceedings into evidence about other cases in order to show the similarities (or lack of similarities) between this case and others, necessitating undue consumption of time. (See Evid. Code, § 352.) There are cases where identifications were reliable, and cases where they were not. The numbers or frequency of each type

have little, if any, connection to the jury's determination in this case. The trial court's ruling was also consistent with the Supreme Court's specific guidance regarding expert testimony on eyewitness identifications. (See *McDonald*, *supra*, 37 Cal.3d at p. 377 [discussing expert testimony regarding "…specific psychological factors *shown by the record*…" (italics added)].) Defendants have not demonstrated anything arbitrary, capricious, or patently absurd about the trial court's ruling. (See *People v. Clark*, *supra*, 63 Cal.4th at p. 572.) We therefore will not disturb it.

B. *Motion to Sever*

Prior to trial, Gutierrez moved to sever charges related to the murder of J.C. (counts 1 and 2) from those related to the attempted murder of V.A. (counts 3 and 4), and Alvarez joined in Gutierrez's arguments. The trial court denied the motion. Defendants here argue this ruling was an abuse of discretion. It was not.

In relevant part, section 954 provides that an "accusatory pleading may charge two or more different offenses connected together in their commission" or "two or more different offenses of the same class of crimes or offenses." (§ 954.) "Joinder is ordinarily *favored* because it avoids the increased expenditure of funds and judicial resources that may result from separate trials." (*People v. Simon* (2016) 1 Cal.5th 98, 122, italics added.) Nevertheless, "'[t]he determination that the offenses are "joinable" under section 954 is only the first stage of analysis because section 954 explicitly gives the trial court discretion to sever offenses or counts "in the interest of justice and for good cause shown."'" (*People v. Lucky* (1988) 45 Cal.3d 259, 276-277 (*Lucky*).)

9

To prevail, the party seeking severance must make a "'clear showing of prejudice.'" (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 (*Alcala*).) "The factors to be considered are these: (1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case." (*People v. Mendoza* (2000) 24 Cal.4th 130, 161.) Those four factors must also be weighed against the benefits to the state from joinder. (*People v. Soper* (2009) 45 Cal.4th 759, 783 (*Soper*).) A trial court's denial of a motion to sever properly joined charged offenses amounts to a prejudicial abuse of discretion only if that ruling falls outside the bounds of reason, based on facts known to the court at the time of the motion. (*Id.* at p. 774; *People v. Geier* (2007) 41 Cal.4th 555, 575.)

Here, the statutory requirements for joinder under section 954 were satisfied because the offenses were all "of the same class of crimes," or "connected together in their commission." (§ 954.) Murder and attempted murder "are both assaultive crimes against the person and, as such, are 'offenses of the same class' expressly made joinable by section 954." (*People v. Miller* (1990) 50 Cal.3d 954, 987.) Gutierrez's two felon in possession charges are not assaultive crimes, but they were each "connected together in their commission" with the murder or attempted murder. (§ 954; see *People v. Koontz* (2002) 27 Cal.4th 1041, 1074-1075 [joinder of petty theft committed on one date with

robbery, vehicle taking, and murder committed on another date was proper under section 954, because the petty theft offense was of the "same class" as the robbery and vehicle taking].) Joinder of all four counts was proper under section 954.

Defendants contend that, because Gutierrez was alleged to be the shooter only in the attempted murder of V.A., and not the murder of J.C., the murder and attempted murder counts were not of the same class of crimes. They provide no authority, however, that supports the proposition that the class of crime should be determined with reference to the defendant's specific role in committing the offense, rather than simply the nature of the offense. The two cases cited in Gutierrez's briefing are inapposite. In *People v. Fulton* (1980) 109 Cal.App.3d 777, the defendant made no argument that the charges at issue were of different classes of crime, asserting only a claim of prejudice. (*Id.* at p. 782.) In *Aydelott v. Superior Court* (1970) 7 Cal.App.3d 718, the Court of Appeal found that several counts involving sexual conduct with minors had sufficient common elements of substantial importance to be properly joined together, but a count of illegally prescribing a narcotic to a different person, apparently not a minor, did not. (*Id.* at pp. 723-724.) Neither of these cases, nor any other authority of which we are aware, support defendants' contention.

Defendants, therefore, could establish error in denying severance only by making a clear showing of prejudice. (*Alcala*, *supra*, 43 Cal.4th at p. 1220.) We do not find anything arbitrary, capricious, or patently absurd in the trial court's ruling that they failed to do so. (See *Soper*, *supra*, 45 Cal.4th at p. 783.)

11

First, a substantial portion of the evidence from the two sets of charges would have been cross-admissible if the murder and attempted murder had been tried separately. As defendants point out, there are obvious ways to distinguish the August 2015 shooting from the September 2015 shooting. Nevertheless, there were also ample similarities, from which a jury could reasonably have inferred a common motive or plan underlying Gutierrez's actions in the two incidents. (See Evid. Code, § 1101, subd. (b); see also *People v. Arias* (1996) 13 Cal.4th 92, 127 ["Because of the factors favoring joinder, a party seeking severance must make a stronger showing of potential prejudice than would be necessary to exclude other-crimes evidence in a severed trial"].) Much of the gang related evidence would have been cross-admissible in separate trials of the murder and attempted murder, as relevant to the gang enhancements common to all of the charges. Also, as noted, there was evidence that the same gun was used in the two shootings. Gutierrez's physical possession and use of the weapon during the shooting of V.A. is at least arguably circumstantial evidence of his intent in relation to the similar shooting of J.C. a month later, as well as his alleged constructive possession of the weapon (count 2) during that shooting. (See Evid. Code, § 1101, subd. (b).)

Second, given the similarities between the shootings, this is not a case where some of the charges are more likely than others to unduly inflame the jury's passions. Defendants have not argued otherwise.

Third, the trial court reasonably could conclude the evidence in support of counts 1 and 2 was substantially similar in weight to the evidence in support of counts 3 and 4,

12

and also that the evidence for all counts, although not overwhelming, was not particularly weak. There was no physical evidence tying defendants to the shootings, and there were arguable grounds for dispute regarding the eyewitness identifications. Nevertheless, the fact remains that both defendants were positively identified as being involved in the murder of J.C. by two eyewitnesses—Gutierrez as the person who confronted J.C. verbally, and Alvarez as the shooter—and V.A. positively identified Gutierrez as the person who shot him. If this factor weighs in favor of a finding of prejudice at all, it would seem to do so arguably or ambiguously, at most.

Fourth, this is not a capital case, no matter whether the charges were tried together or separately.

Thus, of the four factors to be considered, none weigh unambiguously or clearly in favor of a finding of prejudice. It was reasonable for the trial court to conclude that trying counts 1 and 2 together with counts 3 and 4 would not be unduly prejudicial to defendants on that basis.

Moreover, we must also "proceed to weigh all four factors [regarding prejudice] against the benefits to the state of joinder," which are "very substantial." (*Soper*, *supra*, 45 Cal.4th at pp. 780, 783.) "Foremost among these benefits is the conservation of judicial resources and public funds. A unitary trial requires a single courtroom, judge, and court attaches. Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is greatly reduced over that required were the cases separately tried. In addition, the public is served by the reduced delay on disposition of criminal

13

charges both in trial and through the appellate process." (*People v. Bean* (1988) 46 Cal.3d 919, 939-940.)  This factor, obviously, weighs strongly in favor of joinder.

Gutierrez proposes that this case is similar to *Williams v. Superior Court* (1984) 36 Cal.3d 441 (*Williams*), in which the denial of a motion to sever was found to be erroneous.  We are not persuaded by the analogy.  In *Williams*, the Supreme Court observed that the two shootings at issue "differ[ed] in virtually every regard—the location, the time of day, the number of people involved, and the method of attack.  In addition, there is no evidence that the same weapon was used in the fatal assaults, and it certainly could not be fairly claimed that the two episodes reveal a common design or plan."  (*Id.* at p. 450.)  Eyewitnesses had placed the defendant at the scene of the first shooting, along with other assailants, but there was "no direct evidence that [he] fired a weapon."  (*Id.* at p. 445.)  In the second shooting, nine months later, an eyewitness identified the defendant as the person driving a van from which shots were fired, but he was not the only occupant of the vehicle, and again no witness was certain that he was the person who fired the weapon.  (*Ibid.*)  Here, in contrast, the two charged shootings shared various characteristics, including the use of the same firearm, that they were only a month apart, and that eyewitnesses affirmatively identified each of the defendants' roles.  Moreover, *Williams* was a capital case, requiring that the severance issue be analyzed "with a higher degree of scrutiny and care than is normally applied in a noncapital case," particularly because it was "the joinder *itself*" that made the defendant potentially eligible for the death penalty.  (*Id.* at p. 454.)  That consideration does not apply here.

We also disagree with Alvarez's assertion that "*People v. Chambers* (1964) 231 Cal.App.2d 23 (*Chambers*) demonstrates the trial court's error in the present case."  In that case, the defendant Chambers was charged, together with a codefendant, with an assault on a resident of a "rest home" where they both worked.  (*Id.* at pp. 24-25.)  The codefendant was also charged with two other assaults on the same resident, and the evidence against her included evidence of "numerous" uncharged assaults by her over a period of six or seven years.  (*Id.* at pp. 25-27.)  The court characterized that evidence as having a particularly "disgusting, inflammatory character," that "fastened Chambers with moral responsibility (but not criminal responsibility) for the operation of an establishment in which elderly, helpless patients were cruelly treated."  (*Id.* at pp. 27-28.)  There was no evidence Chambers was involved in any of the charged and uncharged assaults allegedly committed by the codefendant, except for the one with which he was charged.  (*Id.* at p. 25-28.)  Nevertheless, the prosecution accentuated the "impression of moral partnership" between Chambers and his codefendant by "an astounding line of prosecution questions suggesting to the jurors that Chambers and [his codefendant] probably shared a single bed."  (*Id.* at p. 28.)  On those facts, the Court of Appeal found that Chambers  "was probably convicted by association with [his codefendant], in trial and otherwise, rather than by evidence of his personal guilt," and that his constitutional right to due process had been violated.  (*Ibid.*)

Here, in contrast, we have no cause to believe that Alvarez was probably convicted by association with Gutierrez.  The prosecution engaged in no improper

15

argument or line of questioning analogous to that in *Chambers*, suggesting that Alvarez is morally responsible for Gutierrez's actions in any charged or uncharged assault where Alvarez was not present. The facts of the two shootings at issue here were not particularly inflammatory, as compared to the brutal and sadistic treatment of elderly patients described in *Chambers*. Nothing in the record leads us to doubt Alvarez's conviction was based on anything other than the evidence presented against *him*, and reasonable inferences therefrom drawn by the jury.

Moreover, in *Chambers*, the issue was whether the defendant's rights were violated by trying him together with his codefendant. (*Chambers*, *supra*, 231 Cal.App.2d at p. 28.) Granting Gutierrez's motion to sever would *not* have resulted in Alvarez being tried separately from Gutierrez; the motion only sought to sever trial of counts 1 and 2, related to the murder of J.C., from trial of counts 3 and 4, related to the attempted murder of V.A. If Gutierrez's motion had been granted, absent an additional motion to sever, Alvarez and Gutierrez would still have been tried together on counts 1 and 2. Even on appeal, Alvarez has contended only that the trial court "erred by refusing to sever Gutierrez's attempted murder related charges." (Bolding omitted.) Neither in the trial court, nor on appeal, has Alvarez expressly contended that his constitutional rights were violated by being tried together with Gutierrez on counts 1 and 2, so we will not consider the issue here. (See *People v. Lind* (2014) 230 Cal.App.4th 709, 716 [failure to move to sever in trial court forfeits issue on appeal].) Thus, *Chambers* adds little to the analysis of whether the trial court abused its discretion in denying Gutierrez's motion.

We conclude that all four counts were properly joined pursuant to section 954. Further, on the record before us, after considering all the relevant factors, we are not persuaded that the trial court exceeded the bounds of reason in concluding that defendants had not made a clear showing of prejudice from the joinder of counts 1 and 2 with counts 3 and 4. We therefore find no abuse of discretion in its denial of Gutierrez's motion to sever.

C. *Gang Enhancement of Count 1*

Defendants contend that their convictions on gang enhancements related to the murder of J.C. (count 1) are not supported by substantial evidence. We are not persuaded.

We review a claim that insufficient evidence supports a jury's gang allegation finding under the familiar substantial evidence standard of review. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 321-322.) That standard requires that we affirm the jury's finding "'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) We examine "the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find [the allegation true] beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) In so doing, we "presume[] in support of the judgment the existence of every fact

17

the trier could reasonably deduce from the evidence."  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

The gang enhancement in section 186.22, subdivision (b)(1) requires the prosecution to prove the defendant committed the charged offense (1) "for the benefit of, at the direction of, or in association with any criminal street gang," and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*People v. Gonzales* (2015) 232 Cal.App.4th 1449, 1464.)  On the first prong, "'[e]xpert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient" to support the enhancement.  (*People v. Vang* (2011) 52 Cal.4th 1038, 1048; *People v. Albillar* (2010) 51 Cal.4th 47, 63 ["Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang'" within the meaning of section 186.22, subd. (b)(1)].)  The expert's opinion, however, must have evidentiary support.  (See, e.g., *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199 [gang enhancement reversed where "the prosecution presented no evidence other than the expert's opinion regarding gangs in general" and the expert's "opinion on the ultimate issue"].)

The second prong "applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced."  (*People v. Albillar, supra*, 51 Cal.4th at p. 66.)  That is, the "any criminal conduct by gang members" provision in the second prong includes the current or

charged offenses. (*Id.* at pp. 65-66.) Moreover, there is no "requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*." (*Id.* at p. 67.)

Applying these standards, we conclude the jury's true finding on the gang enhancement of count 1 was amply supported by substantial evidence. First, there was evidence that J.C. had a reputation for stealing cars at the apartment complex; Alvarez told the police that was the case. A police gang expert testified that, in general, gang members' violent acts in the gang's territory benefit the gang by enhancing its reputation. More specifically, the expert agreed that if the victim was stealing cars on the gang's turf, the violence would benefit the gang, explaining: "[G]ang members want to control the criminal activity within their territory. They don't need unnecessary heat, you know, people stealing stuff and bringing cops in there. As well as, you know, they have the sense of pride and rules about the neighborhood. We are not going to steal form the neighborhood, we're not going to victimize people. Those might be the rules they tell people, you know, these are the rules. They might not necessarily adhere to them themselves. They are not going to let outsiders break those rules." It would have been reasonable for the jury to infer on the basis of this evidence that J.C.'s shooting was for the benefit of the Barrio Mecca Vineyards gang.

It was also reasonable for the jury to conclude that J.C.'s murder was committed "with the specific intent to promote, further, or assist in any criminal conduct by gang

19

members," as required to satisfy the second prong of the analysis. (*People v. Gonzales*, *supra*, 232 Cal.App.4th at p. 1464.) There was evidence that both Gutierrez and Alvarez are active members of the Barrio Mecca Vineyards gang. It is undisputed that Alvarez is a gang member. Although Gutierrez has denied being a current member of the gang, there was evidence to the contrary. A police gang expert opined that Gutierrez is an active member based on previous personal contacts with him; gang related tattoos; prior police reports; his criminal record, which includes pleading guilty to a gang enhancement allegation; and photographs posted to social media and on his cell phone, showing him making gang hand signs. Also, the detective who arrested Gutierrez on the current charges testified that he had encountered Gutierrez before, and during those previous encounters, several years before, Gutierrez had admitted gang membership. He, too, observed that Gutierrez had gang related tattoos. Together with the evidence that Gutierrez had participated in the shooting of J.C., along with the admitted gang member Alvarez who personally fired the shots, the jury reasonably could have rejected Gutierrez's counsel's contention that it is "doubtful" Gutierrez is a current member of the gang. On that basis, the jury reasonably could have concluded that, by murdering J.C. together, Gutierrez and Alvarez both were assisting a gang member in the commission of the offense. That is sufficient to satisfy the second prong of the analysis. (See *People v. Albillar, supra*, 51 Cal.4th at p. 66.)

Defendants' arguments about the sufficiency of the evidence in support of the gang enhancement of count 1 may be summarized as comparisons to cases with different

20

facts, and arguments based on the trial evidence that the jury should have reached a different conclusion. Given the deferential standard of review that applies here, such arguments do not merit detailed discussion.

We also note that defendants have *not* challenged the sufficiency of the evidence with respect to the jury's true finding on the gang enhancement of count 2. It is difficult to imagine a scenario where there is ample evidence to support a gun possession charge and its gang enhancement, but no substantial evidence in support of the gang enhancement of a charge arising from using that same gun on the same occasion. At any rate, we are not persuaded that this case presents such a scenario, for the reasons discussed above.

We conclude that the jury's true findings on the gang enhancement for each defendant related to count 1 were supported by substantial evidence, rejecting defendants' arguments to the contrary.

D. *Eyewitness Identifications of Gutierrez*

Gutierrez contends that his convictions for the murder of J.C. (count 1) and attempted murder of V.A. (count 3) must be reversed because the eyewitness identifications that implicated him are so unreliable that they may not be considered substantial evidence. Not so.

As noted above, in reviewing the record for substantial evidence, we affirm the jury's finding "'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio*, *supra*, 43

21

Cal.4th at p. 357.)  Thus, the jury's findings of fact concerning eyewitness identification testimony are binding on us unless the evidence of identity is "'so weak as to constitute practically no evidence at all.'"  (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 521.) "'To warrant the rejection by a reviewing court of statements given by a witness who has been believed by the trial court or the jury, there must exist either a physical impossibility that they are true, or it must be such as to shock the moral sense of the court; it must be inherently improbable and such inherent improbability must plainly appear.'"  (*People v. Watts* (1999) 76 Cal.App.4th 1250, 1259.)

There is nothing inherently improbable about the eyewitness identifications that implicated Gutierrez in the shootings of J.C. and V.A.  At trial, the defense presented a myriad of reasons why a jury might doubt the accuracy of those identifications, through expert testimony and cross-examination of the eyewitnesses.  Nevertheless, it is hardly physically impossible or inherently improbable that V.A. would have recognized Gutierrez as the person who shot him, or that two of J.C.'s friends would have recognized Gutierrez as the person who demanded that J.C. "stand up," and that his friend move out of the way, in the moments before J.C.'s murder.  Gutierrez here repeats arguments that defendants made at trial, which the jury was free to accept or reject.  It is not our role to second guess the jury's determinations.

E.  *Sen. Bill 136*

The parties agree that under section 667.5, subdivision (b), as amended by Sen. Bill 136, Gutierrez's one-year prison prior enhancement should be stricken.  The parties

22

are correct. Under section 667.5, subdivision (b) as amended, such enhancements may only be imposed for certain sexually violent offenses, and Gutierrez's prior prison sentence was not for such an offense. Furthermore, although Sen. Bill 136 did not become effective until January 1, 2020, which was after Gutierrez's sentencing, we agree with the parties that the change in law applies retroactively to cases not yet final. (See *People v. Lopez* (2019) 42 Cal.App.5th 337, 341; *In re Estrada* (1965) 63 Cal.2d 740, 742.)

Because the trial court imposed on Gutierrez the maximum possible sentence, there is no need for the court to again exercise its sentencing discretion. (*People v. Lopez*, *supra*, 42 Cal.App.5th at p. 342.) Accordingly, we will strike the prison prior and direct the trial court to prepare an amended abstract of judgment reflecting the modification.

F. *Alvarez's Statement to Law Enforcement*

Alvarez contends that his trial counsel's failure to move to suppress his statement to police constituted constitutionally ineffective assistance of counsel. He argues that the statement was obtained in violation of his *Miranda* rights, and that its admission prejudiced him. We find Alvarez has failed to demonstrate ineffective assistance of counsel, even if *Miranda* error is presumed.

1. *Additional Background*

Alvarez's interview with police includes the following exchange:

23

"[DETECTIVE]: Well there's a lot of stuff that I wanna talk to you about right, with you being here. Um, that I wanna share with you. I just can't yet. Until I just get through some policy. Okay?

"ALVAREZ: Okay.

"[DETECTIVE]: That's just policy. I'll just read it to you and okay? You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to your lawyer, have him [] present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish one. Okay? You understand all that?

"ALVAREZ: No but . . .

"[DETECTIVE]: You don't understand?

"ALVAREZ: Just stay silent . . .

"[DETECTIVE]: Uh, I'm sorry what?

"ALVAREZ: To be quiet. To be silent.

"[DETECTIVE]: Okay. Tell me what you don't understand and I'll – I'll help you explain it all. Explain it to you.

"ALVAREZ: Just like with the lawyer part said.

"[DETECTIVE]: Mm-hm. Well it's just – it's – it's your Miranda. It's a Miranda Warning okay?

"ALVAREZ: Okay.

"[DETECTIVE]: Um, but yeah just you-you said the lawyer part right?

24

"ALVAREZ: Mm-hm.

"[DETECTIVE]: So you have the right to talk to a lawyer and have-have him or her present with you while you are being questioned.

"ALVAREZ: Mm-hm.

"[DETECTIVE]: You have a right to have a lawyer. Okay?

"ALVAREZ: Mm-hm.

"[DETECTIVE]: Um, if you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish one. Okay?

"ALVAREZ: Okay. What is that word mean?

"[SECOND DETECTIVE]: I mean it's free of charge, they will get you a lawyer.

"[DETECTIVE]: Mm-hm.

"ALVAREZ: Oh.

"[DETECTIVE]: Which in the court process, uh, no matter what happens, it just depends but you being like this, we have to say that. Um, but within that court process, if anything ever does get to that route, you have a right to a lawyer. So, um, how—how long have you lived over at Casas Ran?

"ALVAREZ: Something like four years.

"[DETECTIVE]: You did understand all that right though? 'Cause I…

"ALVAREZ: Yeah.

"[DETECTIVE]: Okay cool."

During a hearing on in limine motions before trial, the prosecutor informed the court that he intended to introduce Alvarez's statement, and drew the court's attention to a "potential *Miranda* violation," referring to the passage we have reproduced above. The prosecutor expressed that he did not believe there in fact was a *Miranda* violation, and described the exchange between Alvarez and the detectives to the court; he did not have a transcript of the interview with him, however, and his paraphrase of the exchange was not very accurate.[2] The trial court asked Alvarez's counsel if he had reviewed the statement. Alvarez's counsel stated that he had reviewed the statement, and he agreed there was no *Miranda* violation.

During trial, after the video of Alvarez's interview was played for the jury, the court requested a sidebar conference with counsel, and again raised the potential *Miranda* issue regarding the passage cited above. The court made a record of its initial concerns about a potential *Miranda* issue, and its reasons for concluding that in fact there was no violation. It then invited comment from counsel. Alvarez's counsel noted "just for the record, I did not make a motion to suppress my client's statement based on a *Miranda* violation." The court agreed.

---

[2] Counsel summarized the exchange as follows: "[D]uring the reading of the rights to Mr. Alvarez, after [the detective] asked 'Do you understand your rights?' And then Mr. Alvarez said, 'Well, what is that thing about an attorney?' So at that point I believe [the detective] says, 'Well, rights as I have read them to you, do you understand them?' At which point, it was one of those things where Mr. Alvarez – he reads the rights again and then asked, I believe he said, 'Do you understand them?' At which point Mr. Alvarez says, 'Yes.'"

26

2. *Applicable Law*

To establish ineffective assistance of counsel, "the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.  Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

It is well established that "[r]eviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 689.)  "'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.'" (*People v. Zapien* (1993) 4 Cal.4th 929, 980.)  "In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

3. *Analysis*

We may assume for the sake of argument that Alvarez's statement was obtained in violation of his *Miranda* rights, as he has argued on appeal. Nevertheless, this is not a case where there is no conceivable reason for trial counsel to decline to seek to exclude the statement from evidence. As Alvarez's trial counsel emphasized in closing, at no point during the interview did Alvarez confess to any involvement in the murder of J.C. Rather, he was absolutely consistent in the face of intense questioning that he took no part in the shooting. Moreover, the interview statement offers an arguably plausible alternative story of where he was on the night of the shooting; that he was walking alone elsewhere in the apartment complex when J.C. was shot, and that he heard the gunshots and he saw two individuals running away. Alvarez's counsel may have reasoned that it was advantageous to get into evidence Alvarez's affirmative denial of any involvement in the shooting, and a story as to what he was doing instead at the time of the shooting, without having to put him on the stand and subject him to cross-examination. On that basis, counsel may have calculated any problems with the statement, from the perspective of the defense, were outweighed by its potential benefits, and decided not to pursue any potential basis for excluding it.

Of course, for reasons Alvarez has articulated in briefing on appeal, among others, it may have in fact been to his advantage to have the statement excluded. It is easy to criticize defense decisions that precede a guilty verdict. Nevertheless, "'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight,'"

28

and even "'[t]actical errors are generally not deemed reversible . . . .'" (*People v. Weaver*, *supra*, 26 Cal.4th at p. 926.)

Although our record is silent as to exactly what Alvarez's trial counsel's reasoning actually was, it could hardly be more clear that the decision not to pursue a motion to suppress Alvarez's statement was intentional, and not a product of having failed to consider the issue. Moreover, there is a conceivable, at least arguably rational reason for trial counsel to have decided not to seek to suppress Alvarez's statement, even assuming for the sake of argument there was a *Miranda* violation. On this record, reversal for ineffective assistance of counsel is not warranted.

G. *CALCRIM No. 315*

The trial court instructed the jury on evaluating eyewitness identifications using the model instruction CALCRIM No. 315. The instruction told jurors to "consider" a number of "questions," including "How certain was the witness when he or she made an identification." Alvarez did not object to the trial court instructing the jury with CALCRIM No. 315 or request any modification to that instruction. He contends on appeal that the instruction violates his constitutional right to a fair trial.

In *Lemcke*, *supra*, 11 Cal.5th 644, our Supreme Court acknowledged that CALCRIM No. 315 had "the potential to mislead jurors," given the "near unanimity in the empirical research that '"under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy."'" (*Id.* at p. 665.) It referred the matter to the Judicial Council and the council's Advisory Committee on Criminal Jury

29

instructions "to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy. (*Id.* at p. 647; accord *id.* at p. 668.) In addition, the court exercised its supervisory powers to "direct that until the Judicial Council has completed its evaluation, trial courts should omit the certainty factor from CALCRIM No. 315 unless the defendant requests otherwise." (*Id.* at pp. 647-648; accord *id.* at p. 669.) Nevertheless, *Lemcke* rejected the defendant's argument that the instruction violated his due process rights. (*Id.* at pp. 646-647, 654-661.)

For the reasons set forth in *Lemcke*, we reject Alvarez's due process argument. The instruction did not expressly equate certainty with accuracy. (*Lemcke*, *supra*, 11 Cal.5th at p. 657.) Even if it were susceptible to that interpretation, Alvarez could, and in fact did, proffer expert testimony combatting the interpretation, as the *Lemcke* defendant did. (*Id.* at pp. 657-658.) Moreover, the court's other instructions undercut any argument that the certainty instruction lowered the People's burden of proof. (*Id.* at p. 658.) The court instructed the jurors that the defendant is presumed innocent and that the People had the burden of proving guilt beyond a reasonable doubt (CALCRIM No. 220). (*Lemcke*, at p. 658.) The court also instructed jurors that "'[p]eople sometimes honestly . . . make mistakes about what they remember'" (CALCRIM No. 226), that the jurors were responsible for "'judg[ing] the credibility or believability of the witnesses,'" and that the People had "'the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime'" (CALCRIM No. 315). (*Lemcke*, at p. 658.) Finally, Alvarez had an opportunity to cross examine the witnesses who identified him,

30

as well as the investigating officers who conducted the photographic lineups. (*Id.* at p. 660.) Accordingly, the eyewitness certainty instruction did not render Alvarez's trial fundamentally unfair or otherwise violate his due process rights. (*Id.* at p. 661.)

Alvarez attempts to distinguish *Lemcke* on the basis that the trial court here instructed the jury with CALCRIM No. 301, which states in part that "the testimony of only one witness can prove any fact." He also emphasizes language from CALCRIM No. 226, not quoted in *Lemcke*, instructing the jury not to "automatically reject testimony just because of inconsistencies or conflicts" and that [i]f you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest." He has not articulated, however, nor are we able to discern, any reason why such a distinction might make a difference. Indeed, these common pattern instructions or their equivalent most likely *were* given in *Lemcke*, but are not discussed in the opinion because they are not pertinent to the analysis.[3]

Alvarez also argues that here the identification evidence was weaker in various ways than the analogous evidence presented in *Lemcke*. This difference, however, tends to undermine, not support, Alvarez's conclusion. If anything, the various arguable faults or weaknesses in the identification evidence only provided grist for cross examination and defense arguments highlighting those weaknesses. In such circumstances, it would

---

[3] Language identical to part of CALCRIM No. 226 is quoted in *Lemcke*, but only identified as from a "general instruction on witness testimony." (*Lemcke* at p. 658.)

seem less likely, not more, that the jury would apply its instructions on eyewitness certainty in a problematic manner.

Alvarez has not demonstrated that the trial court violated his due process rights by instructing the jury on the eyewitness certainty factor included in CALCRIM No. 315.

H.  *Cumulative Error*

Alvarez argues that he is entitled to reversal because of cumulative error.  We have found no error with respect to the judgment against him, so the cumulative error doctrine does not apply.

### III.  DISPOSITION

Gutierrez's one-year term for a prison prior, imposed pursuant to former section 667.5, is stricken.  The trial court is directed to prepare and forward to the appropriate authorities an amended abstract of judgment reflecting this modification and the resulting reduction in Gutierrez's prison sentence.  In all other respects, the judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL
J.

We concur:

MCKINSTER
Acting P. J.

SLOUGH
J.

32